**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL CASE NO. 1:11cv106**

| | | |
|---|---|---|
| **FRANCES KAY SURRETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **CONSOLIDATED METCO, INC.,** | ) | |
| **LUCY JONES, individually, and** | ) | |
| **STEVE THOMPSON, individually,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| —————————————————— | ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment [Doc. 47].

## I.    PROCEDURAL BACKGROUND

The Plaintiff Frances Kay Surrett initiated this civil action in the Haywood County General Court of Justice, Superior Court Division, against the Defendants Consolidated Metco, Inc. ("ConMet" or "Company"), Lucy Jones, and Steve Thompson, asserting claims arising from the termination of her employment.   In her original Complaint, the Plaintiff asserted claims for violation of the North Carolina Retaliatory Employment Discrimination Act,

N.C. Gen. Stat. §§ 95-240, *et seq.* ("REDA"); wrongful discharge in violation of public policy; gross negligence; negligent infliction of emotional distress; and tortious interference with contract. [Complaint, Doc. 1-2 at 10-21]. Before the Defendants had responded to the original Complaint, the Plaintiff filed an Amended Complaint adding claims for various violations of the Family and Medical Leave Act, 29 U.S.C. §§ 2611, *et seq.* ("FMLA"). [First Amended Complaint, Doc. 1-2 at 31-53]. With the addition of these federal claims, the Defendants removed the action to this Court on the basis of federal question jurisdiction. [Notice of Removal, Doc. 1].

Once the action was removed, the Plaintiff sought leave to file a second amended complaint, which the Court granted. [Doc. 15]. In her Second Amended Complaint, the Plaintiff asserts additional claims for violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA") and the Age Discrimination in Employment Act, 29 U.S.C. §§ 623, *et seq.* ("ADEA"). [Second Amended Complaint, Doc. 16].

On June 21, 2011, the Court entered a Pretrial Order and Case Management Plan in this case giving the parties until February 1, 2012 to complete discovery and until March 1, 2012 to file dispositive motions. [Doc. 7]. On January 27, 2012, upon motion of the Plaintiff, the Court extended the

discovery and dispositive motions deadline by thirty days. [Doc. 46]. Accordingly, the parties had until March 1, 2012 to complete discovery and until April 1, 2012 to file dispositive motions.

On April 2, 2012, the Defendants filed the present Motion for Summary Judgment, seeking dismissal of all of Plaintiff's claims.[1] [Doc. 47]. On that same day, the Plaintiff filed a Motion to Compel further discovery responses from the Defendant. [Doc. 49]. On April 12, 2012, the Plaintiff filed a multitude of motions and pleadings, including a Response to the Defendants' Motion for Summary Judgment that exceeded the Court's 25-page limit for briefs. [Docs. 53-66]. The Court entered an Order on April 18, 2012 denying the Plaintiff's Motion to Compel as untimely, denying the Plaintiff's Motion for Leave to file a summary judgment response in excess of 25 pages, and striking the deposition transcripts and exhibits filed in support of the Plaintiff's Response as being filed improperly under seal. The Plaintiff was given seven (7) days to re-file her pleadings in compliance with the Court's rulings. [Doc. 69].

On April 25, 2012, the Plaintiff re-filed her Response and supporting exhibits as directed by the Court. [Docs. 70-74]. The Defendants filed their

---

[1]Because April 1, 2012 was a Sunday, the motions deadline was extended to the following business day.

Reply brief on May 7, 2012. [Doc. 76]. The Court held a hearing on the Defendant's Motion on June 20, 2012.

Having been fully briefed and argued, this matter is now ripe for determination.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the case." News and Observer Pub. Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made,

the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

Id. (internal citations and quotation marks omitted).

In considering the facts for the purposes of a summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor.  Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.    FACTUAL BACKGROUND

Viewed in the light most favorable to the Plaintiff, the relevant facts are as follows.

## A.   The Parties

ConMet is a manufacturer of lightweight aluminum engineered components for the heavy duty transportation industry.  [Declaration of Steve Thompson ("Thompson Decl."), Doc. 47-1 at ¶ 3].  The Plaintiff was employed at the ConMet's plant in Canton, North Carolina, as a press operator from January 3, 2005 through her termination on July 6, 2010.  The Plaintiff was assigned to Machine Nos. 10, 11, and 12, an assignment which required lifting and other strenuous activities.  [Deposition of Plaintiff ("Pl. Dep."), Doc. 47-2 at 10-12].  The Plaintiff was born on January 9, 1956 and attended school through the tenth grade.  [Second Am. Complaint, Doc. 16 at ¶ 125; Answer to Second Amended Complaint, Doc. 21 at ¶ 125; Pl. Dep., Doc. 47-2 at 7].  While employed at ConMet, the Plaintiff was regarded as an "excellent" employee who performed "good quality work."  [Deposition of Wayne Moore ("Moore Dep."), Doc. 71-3 at 15; Deposition of Gary Ramsey ("Ramsey Dep."), Doc. 71-4 at 24].  Prior to 2010, she had received only one written warning for attendance.  [Deposition of Lucy Jones ("Jones Dep."), Doc. 72 at 31].

Steve Thompson became the Division Human Resources Manager for ConMet's plastics division, which includes the Canton plant, on February 1, 2010.  [Deposition of Steve Thompson ("Thompson Dep."), Doc. 47-5 at 8].

Thompson is responsible for administering all of the division's human resources policies and procedures. [Id.]. As the highest ranking human resources employee, Thompson had responsibility for monitoring compliance with Company procedure (including the attendance policy) and for enforcing those procedures through disciplinary actions when Canton plant employees violated them. [Id. at 9].

Lucy Jones began working for ConMet in June 2008, and was human resources administrator for the Canton plant. [Jones Dep., Doc. 47-7 at 9, 11]. Jones has never had the authority to discharge ConMet employees, and it is undisputed that she did not make the discharge decision at issue in this case. [Thompson Decl., Doc. 47-1 at ¶ 4; Jones Dep., Doc. 47-7 at 258].

## B. ConMet's FMLA Policy and Plaintiff's Prior Use of FMLA Leave

It is undisputed that the ConMet Canton plant is covered by the FMLA. FMLA rights are communicated to ConMet employees in two ways. First, the notice required by Department of Labor regulations, and which contains a description of employee rights, is posted in the plant. [Thompson Decl., Doc. 47-1 at ¶ 5]. In addition, the employee handbook contains an FMLA policy. [Id.]. The Plaintiff admits having read the ConMet employee handbook. [Pl. Dep., Doc. 47-2 at 17-18, 62].

In late 2009, the Plaintiff applied for and took an eight-week FMLA leave for carpal tunnel surgery. [Id. at 16]. Upon learning of the Plaintiff's upcoming surgery, Jones gave the Plaintiff a medical certification form and short-term disability questionnaire. [Jones Dep., Doc. 47-7 at 131-33]. Jones did not describe the purpose of these forms to the Plaintiff, and the Plaintiff simply delivered the forms to her physician for completion. [Id. at 16, 17, 21, 72]. When the Plaintiff recovered from her surgery, she returned to her job without incident. [Id. at 18].

### C.    ConMet's Attendance Policy and the "Appletree" Line

ConMet's plastics division utilizes a points-based attendance policy, which is based on a rolling twelve-month year. Pursuant to this attendance policy, no points are assessed for an "excused absence," such as an absence that qualifies as FMLA leave. [Attendance Policy, Pl. Dep. Ex. 2, Doc. 47-3 at ¶¶ 3.3, 3.9]. If an employee incurs an unexcused absence or works less than four hours of a regular shift as a result of either being tardy or leaving early, the employee is assessed one (1.0) point. [Id. at ¶¶ 3.5, 3.9]. If an employee incurs an absence due to illness and subsequently produces an acceptable doctor's excuse, or if an employee is tardy or leaves early but works more than four hours of a regular shift, one-half (0.5) point is assessed.

[Id. at ¶¶ 3.4, 3.7, 3.9]. The policy further provides that an employee who works a full calendar year quarter without an occurrence of absenteeism will have his or her points reduced by one-half (0.5) point, and that an employee who works one full year without an occurrence of absenteeism "will have all of their points cleaned." [Id. at ¶ 4.7].

The attendance policy also establishes a procedure that employees must use to notify the Company when they cannot report to work as scheduled. They must call a designated telephone number, commonly referred to as the "Appletree" line, in order to report all unscheduled absences. When an employee calls Appletree, an operator records the employee's reason for absence and reports that reason to the Company. Failure to use Appletree to report an absence results in the absence being recorded as a "no call no show." Under the policy, a "no call no show" results in the assessment of two points. [Id. at ¶¶ 3.6, 3.9; Thompson Dep., Doc. 47-5 at 102].

According to Jones, an employee off work for five days due to illness did not have to call Appletree every day in order to receive reduced (0.5) points for each day off, as long as an acceptable doctor's note was produced upon returning to work. [Jones Dep., Doc. 72 at 58, 80-82]. An employee on

approved family and medical leave was not required to call in at all. [Id. at 80].

Conmet's attendance policy sets forth a schedule of progressive discipline for the accumulation of points. At four points, a counseling session is to be conducted by the employee's supervisor and a verbal warning is given. [Attendance Policy, Pl. Dep. Ex. 2, Doc. 47-3 at ¶ 4.1.1]. At six points, a counseling session is conducted by the employee's supervisor with a written warning. [Id. at ¶ 4.1.2]. At seven points, a counseling session is conducted by the employee's supervisor and attended by a Human Resource's representative. The employee also receives a disciplinary report and is suspended for three (3) days without pay. [Id. at ¶ 4.1.3]. At eight points, the employee is discharged "unless mitigating and extraordinary circumstances warrant other action." [Id. at ¶ 4.1.4].

### D.    Plaintiff's 2010 Absences

The Plaintiff was absent from work on January 26, 2010. She called the Appletree line and reported that she was sick. [Thompson Decl., Doc. 47-1 at ¶ 7].

On or around February 4, 2010, the Plaintiff was injured in a forklift accident. [Pl. Dep., Doc. 47-2 at 22-23]. As the Plaintiff was walking to her

work station, a forklift hit a hard plastic container called a "Ropak," which then struck the Plaintiff's left side knee.  The Plaintiff's supervisor, Wayne Moore, escorted the Plaintiff to a production office, where she completed an accident report.  Although the Plaintiff told Moore that her leg was "tingling" and was "bothering" her, she did not tell anyone that she had injured her knee, nor did she ask for any medical treatment that day.  [Id. at 22-23, 26-27].  Moore recalled observing the Plaintiff limping at work, although he could not specifically recall whether he observed this before or after the accident. Moore also recalled that the Plaintiff told him that her knee was bothering her. [Moore Dep., Doc. 71-3 at 74-76, 101].

The Plaintiff took a day of vacation the following day, February 5. [Jones Dep. Ex. 10, Doc. 72-2 at 39].  The Plaintiff did not inform the Company that this absence was in any way connected to the forklift incident. [Thompson Decl., Doc. 47-1 at ¶ 6].

On February 23, 2010, the Plaintiff was again absent from work.  She reported the absence through Appletree on February 22, 2010, stating that she had strep throat and would report to work two days after her absence. [Thompson Decl., Doc. 47-1 at ¶ 6].  On March 25, 2010, the Plaintiff was absent and, through Appletree, reported that she was sick.  [Id.].

Following the forklift accident, the Plaintiff continued to experience pain and swelling in her knee. She did not seek medical treatment for her injury, however, until March 27, 2010, when she requested to leave work early to go to the emergency room. [Id. at 23]. An x-ray of the knee taken at that time showed no abnormalities. [Pl. Dep., Doc. 47-2 at 24, 76-78; Deposition of Frank Moskos, M.D. ("Moskos Dep."), Doc. 71-5 at 14-15].

The Plaintiff was again absent from work from April 20 through April 23, 2010. On April 20, 2010, the Plaintiff saw a physician for complaints regarding her hand. [Pl. Dep., Doc. 47-2 at 32]. On April 20, 2010, the Plaintiff called the Appletree line and reported that she had a doctor's appointment. [Thompson Decl., Doc. 47-1 at ¶ 7]. On April 23, 2010, the Plaintiff reported to Appletree that she was "under [a] doctor's care" but provided no additional information. The Plaintiff did not report her absences on April 21, 2010 and April 22, 2010. [Id.].

On or around April 26, 2010, the Plaintiff provided a note from her physician to ConMet. The note was on the letterhead of her treating physician, Dr. Mark Kinter, and was dated April 20, 2010. The note simply stated that "[t]he patient's absence is physician advised due to illness[.] This certifies that she has been under our care for this problem." [Pl. Dep. Ex. 2,

Doc. 47-2 at 37]. The Plaintiff was assessed a total of four points for her four absences in April 2010, bringing her total number of attendance points to 5.5. [Jones Dep. Ex. 9, Doc. 72-2 at 13]. Human Resources records further indicate that the Plaintiff left work early for an unspecified reason on June 10, 2010, for which the Plaintiff was assessed an additional 0.5 point, thereby bringing her total number of attendance points to six. [Id.].

The Plaintiff applied for a transfer to a less strenuous position in the receiving department to "take a break off" her assigned machines. [Pl. Dep., Doc. 47-2 at 12-13]. On June 18, 2010, Jones informed the Plaintiff that she was unqualified for the position because of her absences and time off from work "under a doctor." [Id. at 12-13, 85-86; Jones Dep., Doc. 47-7 at 172-73].

After her discussion with Jones, the Plaintiff told her supervisor that she needed to leave work early because her leg was hurting.[2] [Pl. Dep., Doc. 47-2 at 53-54]. Under the attendance policy, the Plaintiff was assessed one point for this absence, bringing her total accumulated points to seven. [Jones Dep., Doc. 72-2 Ex. 9].

---

[2]Plaintiff's supervisor, Gary Ramsey, testified that the Plaintiff did not mention her leg when she asked to leave, but rather stated that she ought to quit since she was not getting the transfer she requested. [Ramsey Dep., Doc. 47-6 at 32]. At this stage in the proceedings, however, the Court must accept the Plaintiff's version of this event as true.

The Plaintiff's next scheduled day of work was June 21, 2010, but she did not report to work. The Plaintiff called the Appletree line and reported that she had a doctor's appointment that day and would not be in to work. [Pl. Dep., Doc. 47-2 at 41]. Later that same day, the Plaintiff attempted to call the human resources department to report that she would not be at work that day due to a doctor's appointment. [Id. at 92-93]. The Plaintiff's call was transferred to the front office instead. She told the woman who answered the call that she had a doctor's appointment and would not be at work that day. [Id. at 41, 90-94].[3]

The Plaintiff saw Dr. Frank Moskos on June 21, 2010. Dr. Moskos ordered an MRI of the Plaintiff's knee. [Id. at 90]. Dr. Moskos prepared a note dated June 21, 2010, which stated as follows:

> The patient's absence is physician advised due to illness or injury. This certifies that he or she has been under our care for this problem. Please excuse from work from 6/21/2010-6/28/2010 for reason of illness and need for workup.

[Moskos Dep. Ex. 1, Doc. 71-6 at 13].

On Tuesday, June 22, the Plaintiff called Jones, and told her that she had a doctor's note placing her under restrictions, and referring her for an

---

[3]ConMet denies receiving any calls from the Plaintiff on June 21. [Doc. 48 at 7].

MRI.  Jones did not ask the Plaintiff to bring the note to the Company, nor did she request any other information or documentation about the Plaintiff's absence.  [Pl. Dep., Doc. 47-2 at 94-96].

On Wednesday, June 23, the Plaintiff underwent an MRI.  On Thursday, June 24, Dr. Moskos notified the Plaintiff that the MRI showed a tear in the lateral meniscus of the left knee, and that he would refer her to an orthopedic surgeon for a consultation.  An appointment with Dr. Christopher Catterson, an orthopedic specialist, was scheduled for Tuesday, July 6.  [Pl. Dep., Doc. 47-2 at 96-98; Moskos Dep., Doc. 71-5 at 35-37].

On Monday, June 28, the Plaintiff called Jones and informed her of the upcoming consultation with Dr. Catterson about her knee.  The Plaintiff also told Jones that she was still under a doctor's care.  [Pl. Dep., Doc. 47-2 at 98-99].  Jones did not ask the Plaintiff about her medical condition or mention the FMLA during this conversation.  [Id. at 100-01].  Later that day, Jones left a message on the Plaintiff's answering machine asking her to come to a meeting with Thompson to discuss her absences.  [Id. at 99].  By that time, according to ConMet, the Plaintiff had accumulated more than eight points under the attendance policy.

### E.    The June 30, 2010 Meeting

The Plaintiff met with Thompson and Jones on June 30, 2010.  At that meeting, Thompson gave the Plaintiff a copy of her attendance report, which documented her absences from June 2009 through June 2010.  Thompson, however, addressed only the Plaintiff's April absences at this meeting.  [Pl. Dep., Doc. 47-2 at 39-40].  According to Plaintiff, Thompson told her that she needed to "fix" the April absences or else she would be "in trouble."  [Pl. Dep., Doc. 47-2 at 29-30].  Thompson contends, on the other hand, that he told Plaintiff that if she had a valid medical excuse for these absences, she should obtain medical documentation for him to consider.  [Thompson Decl., Doc. 47-1 at ¶ 9].[4]  The Plaintiff responded that she had already produced a note from Dr. Kinter for these absences.  [Pl. Dep., Doc. 47-2 at 30]. Thompson then asked Jones whether she had received such a note from the Plaintiff, and Jones replied that she had not.  [Pl. Dep., Doc. 47-2 at 106].

Neither Thompson nor Jones clarified what other documentation the Plaintiff was required to produce regarding these absences.  According to Jones, the Plaintiff was given one week (until July 7) to provide any

---

[4]The Defendant takes the position that if the April absences were deemed to be FMLA-qualifying, the Plaintiff's point total would have been reduced to seven, thereby bringing her under the eight points that would have required termination under ConMet's attendance policy.  [Thompson Decl., Doc. 47-1 at ¶ 9].

documentation about the April absences.  [Jones Dep., Doc. 72-1 at 203-04, 214].  Plaintiff was not provided with any FMLA certification forms to take to her physician.  [Pl. Dep., Doc. 47-2 at 106, 109].

During the meeting, the Plaintiff informed Thompson that she was having surgery on her knee as a result of the accident on February 4, and that she had an upcoming appointment with an orthopedic specialist.  [Id. at 28].  Thompson never told the Plaintiff that she needed to submit any documentation for these upcoming absences, nor did he request documentation for her absences beginning on June 21.  [Pl. Dep., Doc. 47-2 at 107].

## F.    Plaintiff's Termination

The Plaintiff consulted with Dr. Catterson on Tuesday, July 6, at which time she elected to proceed with knee surgery to repair the meniscal tear.  [Pl. Dep., Doc. 47-2 at 113-14].  Following her appointment, the Plaintiff called Jones and told her that she had just gotten out of the doctor's office and had all of the documents from seeing the doctor.  [Id. at 117].  Jones then put the Plaintiff on hold.  When she came back on the line, Jones stated that she had spoken with Thompson, and that it was in the company's best interest that the Plaintiff not work there anymore.  [Pl. Dep., Doc. 47-2 at 43, 117-18].

Following her termination, the Plaintiff filed a worker's compensation claim based upon the February 4 forklift incident. [Pl. Dep., Doc. 47-2 at 52]. The Plaintiff had knee surgery on July 14, followed by a brief recovery period. In a Return to Work Statement dated August 23, 2010, Dr. Catterson stated that the Plaintiff was unable to work due to acute medial and lateral miniscus tears. [Thompson Decl. Ex. F, Doc. 47-1 at 12]. On September 2, the Plaintiff met with Dr. Catterson who stated that she was doing well and that she should only return to see him "on a PRN basis." [Moskos Dep. Ex. 6, Doc. 71-6 at 19]. A Second Return to Work Statement was prepared by Dr. Catterson on April 14, 2011, indicating that the Plaintiff was capable of returning to full duty work without restrictions. [Thompson Decl. Ex. G, Doc. 47-1 at 13].

## IV.    DISCUSSION

Upon careful review of the record, viewing it in the light most favorable to the Plaintiff, the Court concludes that the Plaintiff's forecast of evidence presents genuine disputes of material fact sufficient to preclude summary judgment on the Plaintiff's claims asserted under the North Carolina REDA (First Claim); for wrongful discharge in violation of public policy as expressed in the REDA (Seventh Claim); for violations of the FMLA (Second, Third, and Fourth Claims); and for violation of the ADA (Fifth Claim). Accordingly, for the

reasons stated in open court at the summary judgment hearing, the Court will deny the Defendants' Motion for Summary Judgment as to these claims.

At the summary judgment hearing, the Plaintiff conceded that she had failed to present a forecast of evidence to support her claim of negligent infliction of emotional distress (Eighth Claim), and she agreed to withdraw this claim. Accordingly, the Plaintiff's claim for negligent infliction of emotional distress will be dismissed from this action with prejudice.

With respect to the Plaintiff's remaining claims for violation of the ADEA and for gross negligence and tortious interference with contract, the Court will grant the Defendants summary judgment, for the reasons set forth below.

## A.    Age Discrimination Claim

The Plaintiff claims that ConMet subjected her to various adverse employment actions because of her age, including: (1) taking disciplinary actions against her; (2) interfering with her right to take family and medical leave; (3) subjecting her to harassment; (4) denying her a transfer to a position in the shipping and receiving department; and (5) terminating her employment. [Doc. 16 at ¶ 132]. ConMet now moves for summary judgment as to this claim, arguing that the Plaintiff cannot demonstrate that she was subjected to any disparate treatment based upon her age. [Doc. 48 at 22].

The Plaintiff does not address this aspect of ConMet's motion, except to assert in a footnote in her brief that ConMet's motion as to this claim "should be denied, or deferred pending discovery, because ConMet refused to answer the most basic discovery relevant to this claim, such as the age(s) of the individual(s) who replaced [the Plaintiff], and the ages of the terminated employees at the Canton facility." [Doc. 70 at 12 n.6]. Without such information, the Plaintiff contends that she is "unable to investigate, and obtain, facts necessary to prove this claim." [Id. (citing Fed. R. Civ. 56(d)].

Rule 56(d) of the Federal Rules of Civil Procedure provides as follows:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). Pursuant to this Rule, summary judgment may "be refused where the nonmoving party *has not had the opportunity* to discover information that is essential to his opposition." Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir.1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added)).

Here, the Plaintiff had ample opportunity during the discovery period to discover the information that she claims is essential to her opposition to the Defendants' motion for summary judgment on this claim. The discovery period, however, has long since ended, and the Plaintiff failed to file a timely motion to compel production of this information. Accordingly, the Plaintiff has failed to show that she is entitled to relief under Rule 56(d), and therefore, her request to defer ruling on the Defendants' motion for summary judgment is denied.

Under the ADEA, a plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). A plaintiff can prove her claim either through direct or circumstantial evidence. See id. If the only evidence of discrimination is circumstantial, the plaintiff may use the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to prove her claim. Under this framework, the plaintiff must first establish a *prima facie* case of age discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. In a typical discharge case under the ADEA, a plaintiff may establish a *prima facie* case by showing

(1) that she was in the protected age group; (2) that she was discharged; (3) that at the time of discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) following her discharge, she was replaced by an individual of comparable qualifications outside the protected class.  Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315 (4th Cir. 1993).  Once the plaintiff satisfies this initial burden, the burden then shifts to the employer to demonstrate a legitimate, non-discriminatory reason for its action.  Hill, 354 F.3d at 285. Once the employer has proffered a legitimate, non-discriminatory reason, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the proffered reason given is a pretext for age discrimination.  Id.  The Plaintiff can establish pretext by establishing that the reasons given are "unworthy of credence" or by presenting other evidence "sufficiently probative of age discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004).

Here, the Plaintiff has failed to present a forecast of evidence sufficient to establish a *prima facie* case of age discrimination.  Specifically, the Plaintiff has failed to present any evidence that she was replaced by a younger individual of comparable qualifications.  Furthermore, even assuming the Plaintiff could establish a *prima facie* case, the Plaintiff has presented no

forecast of evidence to suggest that the proffered reason for her termination --
excessive absences in violation of ConMet's attendance policy -- was a
pretext for *age* discrimination. The Plaintiff simply has produced no forecast
of evidence, direct or otherwise, to suggest that age was the "but for" cause
of her termination. Accordingly, the Court will grant ConMet's motion for
summary judgment as to the Plaintiff's claim for age discrimination under the
ADEA.

###    B.    Gross Negligence Claims

In her Eighth Claim, the Plaintiff alleges that the Defendants owed a
duty to refrain from taking adverse employment actions against her in violation
of the FMLA, ADA, and REDA[5]; that the Defendants willfully, wantonly, and/or
recklessly breached the aforementioned duties by taking various adverse
employment actions against her; and that the Defendants' gross negligence
caused her damages. [Second Amended Complaint, Doc. 16 at ¶¶ 143-56].
Because the Defendants' actions were "egregiously wrongful, and done with

---

[5]The Plaintiff also alleges that the Defendants owed a duty to refrain from taking
adverse employment actions against her in violation of the ADEA [Second Amended
Complaint, Doc. 16 at ¶ 149]; however, as the Plaintiff's ADEA claim has been
dismissed, the Court need not address this aspect of the Plaintiff's gross negligence
claim.

malice, willful and wanton conduct, and with willful intent to injure her," the Plaintiff asserts that she is entitled to punitive damages. [Id. at ¶ 157].

In order for the Plaintiff to prevail on a claim of gross negligence, she must establish not only all the elements of ordinary negligence, including the elements of duty, causation, proximate causation, and damages, see Martishius v. Carolco Studios, Inc., 355 N.C. 465, 473, 562 S.E.2d 887, 892 (2002), but she also must establish that the Defendants' conduct was "willful, wanton, or done with reckless indifference." Sawyer v. Food Lion, Inc., 144 N.C. App. 398, 403, 549 S.E.2d 867 (2001). Here, the Plaintiff argues that the Defendants' violation of the statutory duties imposed by the FMLA, ADA, and REDA support a claim for gross negligence under North Carolina law. In support of this argument, the Plaintiff cites Toomer v. Garrett, 155 N.C. App. 462, 574 S.E.2d 76 (2002). Toomer, however, is distinguishable from the present case. In Toomer, the plaintiff, a former state government employee, alleged that a state official disclosed his confidential personnel file without authority or justification. Id. at 482, 574 S.E.2d at 92. In asserting a claim for gross negligence, the plaintiff argued that the defendant's duty to refrain from disclosing his personnel file arose from two North Carolina statutes which required such files to be kept confidential and which provided criminal

penalties for allowing the unauthorized access of such records. Id. at 482-83, 574 S.E.2d at 92. The North Carolina Court of Appeals agreed with the plaintiff, concluding that these allegations were sufficient to state a legal duty on the part of the defendant, and it therefore allowed the plaintiff's gross negligence claim to proceed. Id.

In Toomer, the statutes upon which the plaintiff relied to establish a legal duty provided no remedies for a civil litigant to pursue in the event of their violation, only criminal penalties. By contrast, in the instant case, the Plaintiff's allegations of a legal duty are premised upon statutes which specifically provide civil remedies for violations thereof. As such, the Plaintiff's attempts to plead these statutory violations as acts of "gross negligence" under North Carolina law are superfluous.[6]

In sum, the Court concludes that the violations of the FMLA, ADA, and REDA as alleged by the Plaintiff do not support a cause of action for gross

---

[6]The Court is unclear as to what the Plaintiff believes she may gain by attempting to assert a gross negligence claim arising from the violation of a remedial statute, such as the FMLA, ADA or REDA. To the extent that the Plaintiff attempts to pursue a claim for punitive damages for the Defendants' willful and wanton violation of these statutes, the availability of such remedy is already addressed by the statutes themselves. Under some of these remedial statutes, such as in the case of the FMLA, punitive damages are not recoverable. See Keene v. Rinaldi, 127 F.Supp.2d 770, 772 (M.D.N.C. 2000). To allow Plaintiff to maintain a claim for gross negligence would impermissibly graft a state law remedy for punitive damages onto a federal statutory cause of action which does not provide for such a remedy.

negligence under North Carolina law. Accordingly, the Plaintiff's gross negligence claim is dismissed.

### C. Tortious Interference with Contract

In her claim for tortious interference with contract, the Plaintiff alleges that Defendants Jones and Thompson "concocted a scheme to induce Defendant ConMet to terminate Surrett's employment" and thus wrongfully interfered with her valid employment contract. [Second Amended Complaint, Doc. 16 at ¶ 176]. The Plaintiff further alleges that ConMet ratified and condoned Defendants Jones and Thompson's conduct and thus is also liable for this tortious interference. [Id. at ¶ 177].

In order to establish a claim for tortious interference with contract, a plaintiff ordinarily must show that an "outsider" interfered with her contractual relations with a third party. See Varner v. Bryan, 113 N.C. App. 697, 701-02, 440 S.E.2d 295, 298 (1994) (reciting elements). North Carolina courts have recognized a claim for tortious interference where one who is not an outsider to the contract may be liable for interfering with a contract. This type of "non-outsider" claim requires the additional showing that the tortfeasor acted with "legal malice," that is, the tortfeasor did "a wrongful act or exceed[ed] his legal right in order to prevent the continuation of the contract between the parties."

See id. at 702, 440 S.E.2d at 298; Kwan-Sa You v. Roe, 97 N.C.App. 1, 387 S.E.2d 188 (1990).

In the present case, the Plaintiff attempts to assert a "non-outsider" claim for tortious interference against both Thompson and Jones, and to hold ConMet liable for "ratifying" the individual Defendants' actions. It is undisputed, however, that the decision to terminate the Plaintiff's employment was made by Thompson, acting in his capacity as Division Human Resources Manager for ConMet. Thus, if ConMet breached the Plaintiff's employment contract at all, it did so through the actions of its agent/employee, Thompson. The Plaintiff has cited no authority, and the Court is not aware of any such authority, that would support the novel proposition advanced by the Plaintiff that a decisionmaker's termination of a plaintiff's employment can constitute both a wrongful breach of the employment contract *and* a wrongful interference which led to that breach of the employment contract. Plaintiff's tortious interference claim against Thompson, therefore, is dismissed.

With respect to Jones, it is undisputed that Jones provided information to Thompson regarding the Plaintiff's attendance, but that she did not participate in the decision to terminate the Plaintiff's employment. Thus, the Plaintiff may sustain a tortious interference with contract claim against Jones

if she can establish that Jones, as a "non-outsider," acted with "legal malice" in providing that information to Thompson.  See Varner, 113 N.C. App. at 702, 440 S.E.2d at 298.   Upon carefully reviewing the evidence, the Court concludes that the Plaintiff has failed to present a forecast of evidence to establish that Jones acted outside of the scope of her authority in her actions toward the Plaintiff.  Accordingly, the Plaintiff's claim for tortious interference with contract against Jones is dismissed.

Because neither of the individual Defendants committed tortious interference, the Plaintiff's claim against ConMet for "ratifying" the individual Defendants' conduct also must fail.  Even if the Plaintiff could sustain a claim for tortious interference against one of the individual Defendants, however, the Plaintiff has failed to cite any authority to support holding a corporation liable for tortious interference *with its own contract.*   For these reasons, the Plaintiff's claim for tortious interference against ConMet is therefore dismissed.

## O R D E R

Accordingly, **IT IS, THEREFORE ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 47] is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) The Defendants' Motion for Summary Judgment is **DENIED** with respect to the Plaintiff's claims asserted under the North Carolina REDA; for wrongful discharge in violation of public policy as expressed in the REDA; for violation of the FMLA; and for violation of the ADA; and

(2) The Defendants' Motion for Summary Judgment is **GRANTED** with respect to the Plaintiff's remaining claims for violation of the ADEA and for gross negligence and tortious interference with contract.

**IT IS FURTHER ORDERED** that, in light of the Plaintiff's withdrawal of the same, the Plaintiff's claim for negligent infliction of emotional distress is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

Signed: July 2, 2012

Martin Reidinger
United States District Judge